And here, there's specific language that the arbitrator did not wrestle with that talked about any extensions to a deadline for filing agreements have to be in writing as any confirmation of an oral agreement to extend it. Well, let me follow up on that. So, let me give you a hypothetical that is not what happened here. Let's say the day before a grievance is due, the union rep with authority calls the management rep with authority and says, I just came down with COVID. I know my grievance is due tomorrow. I can't do it. I can't have access to a computer. I'm really ill. Will you agree that we have an extra week to do it? And, you know, we can't do this in writing. And the management rep says, of course, you're my friend. I'm really sad you're sick. Absolutely, you have a week. We will never raise the written agreement provision. And contrary to that, they do. And the arbitrator says, well, you're stopped from taking that position. Same argument from management? I think that would be, if there was, to take your hypothetical a step further, if there was a practice between the parties of doing that regularly. No, no, no practice. Single incident? Single incident. I think there would be the same problem, which is, you know, there's no timeline on when the written confirmation of the extension has to be done. So it becomes incumbent upon the union to follow up with the written confirmation once they're healthy enough to do so. So how is your position in that regard consistent with the congressional policies that underlie RLA, which is, in fact, I think, to leave labor and management, to work in a collegial atmosphere and to resolve their disputes in the way that it's written, but to understand that it's a dynamic process? How does your argument in my hypothetical situation further what I think are the goals of the RLA and generally the way Congress has regulated labor-management relations? Well, it would be a more difficult fact situation, of course, that I'm not presented with in this case, Your Honor. But certainly, you know, parties are supposed to give, you know, careful consideration to all parts of their contract, including the procedural aspects. So if the union had wanted a company, because it's really a company whose ox is being bored by this provision just as easily as the union, if they wanted to negotiate a different process, they were free to do so. But absent that, again, you could get to a situation where you could argue that the carrier, in your hypothetical, violating its obligation under the statute to make and maintain agreements by doing that. That's a different argument about whether or not it's entitled under the contract to enforce its written confirmation. But basically, management's view here is a version of sort of caveat emptor. Well, it's not so much caveat emptor. It's that we carefully negotiated these provisions for a reason. And I think this case is a perfect example of why we have those. Was there an extension? You know, we say not. And now we've got a court who implied one product whole cloth, even though we said you can't have those. Well, as I understand it, the arbitrator viewed it as a mutual consent to await the negotiation of the supplemental letter written at the time and the conda. And I can't help but wonder if you had won the arbitration, whether you'd be making the opposite argument precisely. I'm not sure what you mean there. Well, if the merits had gone your way. Well, in that case, the New York deal was true. You wouldn't be saying, no, no, please don't allow us to have a success. Well, it would be lewd at that point. It would be a heartless error. Well, it might not be from the union's perspective. I mean, you would just flip sides on this argument, I'm guessing. Well, let me address the issue. Let me just ask you why it was improper in the year before the arbitrator to look at the parties' conduct and determine that there was an implied consent by what they did. Well, it didn't go beyond what he said in the conda. What he looked at is two other sections of the collective bargaining agreement that related to a totally separate issue, which is the selection of a new vendor for this scheduling system and negotiation of a letter of agreement about what that system might look like in the future. What we're dealing with here is a separate issue, which is under the existing system, does the company get to solve must work days first or not? And I'll direct you to the email that touched this all off, which is in the excerpts of record of 324, 325, where the union scheduling committee at the time, November 2016, said, you have to implement this now. You have to make this change now to how you solve must work days. We agreed to this. It has to be implemented December 1st. And we request, please implement the required changes to comply with the CBA in the current solving solution until we have agreed upon a PBS bidding and award software system. So he himself, the union scheduling committee, was separating those two issues out. And that was the problem. The court below and the system board never wrestled with this issue of, how do you have an implied waiver when we have a specific written provision that says you can't? And that's what happened in the Marshall Durbin case that we cite in our, this is exactly on all fours, where there were two arbitrators in that case who found cases to be timely, despite the fact that there had been procedural steps in the process that had been overlooked and found implied waivers. And the court there said there is no room in the collective bargaining agreement for an implied waiver. And there's no past practice evidence, Judge Graber, to your question, that was evidence that the parties had a practice of granting waivers that were not in writing, despite the written requirement that goes to our due process argument, which would have shown that there aren't, that there was a history of the parties insisting on compliance with that. In your view, what was the latest date on which a grievance had to be filed in writing? Fifteen days after November 16th of 2016. I should have added that. And they did start filing grievances in March of 2018, which was, again, inconsistent with the ruling of the system board that there was, you know, an implied understanding that we would wait until the end of the process for negotiating this letter of agreement, because that didn't end until several months later. I'm sorry. I was just going to say, isn't there a way to read these e-mails as being a written grievance? Your explanation is not in compliance with the collective bargaining agreement, which is November 14th. No, the grievance is a formal process. This is the step prior to the grievance that's set forth in the collective bargaining agreement, where they have to bring that forward to the company, the company informally. The company then makes a response. That's what this is. And, again, the system board didn't find that to be a problem. That's how it works. Then the formal grievance is the next stage, and there's a specific procedure in the collective bargaining agreement for how to file a grievance. Am I remembering correctly the date that you gave that the arbitration board agreed that that essentially would have been the date, but for the extension that they felt had occurred? That is correct. I'd like to save the rest of my time for rebuttal, if there's anything else. Do my colleagues have any more questions? Thank you. Thank you. May it please the Court, Michael Urban. I'm of the Urban Law Firm. I'm here on behalf of the International Brotherhood of Teamsters, the airline division, Local 2118. If I might, I wanted to address first the supplemental question that the Court asked. I do agree with Mr. Hall with regard to the extension of the collective bargaining agreement, and the Ninth Circuit kind of look at that can be found specifically at the Association of Flight Attendants versus Horizon Air, 976 F2nd 541. That's a 1992 case. Essentially that the parties, once a contract ends, must work together to get to a new contract, and so it continues. The second part of that is that the parties have continued to follow the contract since that 1991, excuse me, 2021 date, and we are still going through the grievance process. We are still having hearings and arbitrations, so it is continuing. They have even imported and agreed to the NMB, which is the additional step under Railway Labor Act. The parties are going to be in mediation starting as early as April and May, so the contract is continuing. It is not moot. I wanted to specifically look at the decision that was made here and what this Court's review process of that decision is. In other words, the limitations on what they can do and should not do. The District Court, I think, found that their purview of review was limited to whether or not there was an excess of jurisdiction, whether or not there was fraud, or whether or not the arbitrator did not follow the contract. But there is clearly an action by the Board of Adjustment, which is established under the Railway Labor Act, to review and do arbitration. Let me give you a hypothetical. Let's say the Arbitration Board, in rendering its decision, had said, We've looked at 18E. It requires time limits to be extended by written agreement. I'm looking right now at ER 223.  And, you know, this is an unfair provision. It just doesn't take into account the circumstances that can normally arise in collective bargaining negotiations. We see it's there, but we're not going to enforce it because we think it's unfair. Would the union be taking the same position if the Board or if the Arbitration Board had made that hypothetical ruling that, No, you can't review it. They have the right to do that? I think they would for one reason only, and that is because of this unusual collective bargaining agreement. I think the parties in this collective bargaining agreement did something that probably should not be done in most agreements, and that is they entered into an agreement to agree. If you look at the implementation agreement at the back of the collective bargaining agreement, the parties say such things as they recognize the mutual benefits associated with the new scheduling system. The parties wish to work cooperatively in choosing that system, and then the company wishes to have a positive and constructive relationship with the union's PBS committee. And then they go on in Section 1589 to say, We're going to do this. We're going to have this very optimistic schedule of implementing this in 60 days, having it operative in 180 days, but it also says we can extend those time periods. Now, does it make any sense for there to be grievances filed and arbitrations proceeding while they're working under this cooperative system? Well, but when you say, Does it make any sense? I mean, there are often provisions in contracts that one or another party might say later, Well, this doesn't make any sense, but if that's the provision, why would it negatively impact the thoughts behind what you've said to just require a belt and suspenders approach to say, We have this thing that requires a written agreement. You really don't want us to file grievances now while we're engaged in this cooperative negotiating process, right? No, we don't. So let's just agree to this in writing so there's no possible ambiguity, because that's what the contract says. Why would that approach be inconsistent with the provisions that you've just read? I don't think it's inconsistent, Your Honor. I think that what the parties did and what the Board of Adjustment looked at is consistent. For example, in the Supplemental Exit Proof Record 9-13-28-38, the parties had extended the time period for this 15A9 negotiation, and it's confirmed in a writing which the Board of Adjustment looked at. So there was a writing talking about the extension, and one of the witnesses who was called by the company was the Director of Labor Relations, Andrea Ganson. The company knew in the five days of arbitration that the union was making this allegation about the continuation, and that's why the grievances weren't filed until March. She did not even testify in contradiction of that extension or what the parties had agreed to with regard to working together until such time as they no longer could. She didn't testify, did she?  that what the course of the parties' conduct had been to effect a waiver of 18E, did she? She did not. No. But she did testify that the parties had agreed to present these 90 grievances to this Board of Adjustment on this issue without making any statement to contradict the testimony and the correspondence that showed there was an extension and they were working cooperatively beyond the period of what would be a normal grievance filing period. My point is that the Court, excuse me, the Court, the Board of Adjustment specifically looked at all of the provisions in the collective bargaining agreement and the parties' actions with regard to that language and made that interpretation. And I believe that is the reason why the district court and this court really has limited ability to review that. The entire Board of Adjustment decision is based on an interpretation of the collective bargaining agreement and the evidence presented in those five days. I think that also goes to the argument that's being made with regard to lack of due process. They presented the issue of untimeliness. They heard the evidence presented first by the union with regard to- Well, on your prior point about, you know, the Board looked at this. The cases that the district court distinguished, putting aside whether the distinguishing of those cases was proper, in those cases as well, the arbitrating entity looked at various issues in the contract, concluded various things, and the courts, I think there was a district court, I think it was the Fifth Circuit, they set it aside. So, I mean, the fact that the Board looked at something doesn't really mean that we have no jurisdiction to consider it if, in fact, they're doing something that is contrary to the jurisdiction they have, right? That is correct. And if you think about the Marshall-Durbin case, which counsel is relying on- That's the Fifth Circuit one, or is that- The Fifth Circuit one is actually the Southwest case, but the Marshall-Durbin one to which counsel argued today involved the termination of employees. And in that particular case, the reason they held that the Board of Adjustment exceeded its jurisdiction is that they missed an entire step in the grievance process, and therefore it wasn't even properly before that Board of Adjustment yet, because they didn't follow that step. And more importantly, in Southwest Airlines, the key to that Fifth Circuit case, the parties in writing stipulated- This was a case involving four different grievances involving cleaning, but that particular case, the parties stipulated that the Board of Adjustment, in reviewing that case, only had jurisdiction to consider timeliness. And that Board of Adjustment went on and considered and decided the merits of the case. That's why it was overturned. They had limited, specific, written jurisdiction, which they exceeded. That's not what happened here. Well, I mean, management's argument is that is what happened here, because management's argument is you have this provision that says extensions must be in writing and that the grievances can't be considered by the Board if they were late but for an extension and there was no writing extension. I mean, that is what they're arguing. It may not be right, but it is what they're arguing. And I think the Board looked at that evidence, including the letters of correspondence that confirmed the extensions, and found that the parties did, in fact, have an extension, even if it was an- As you even pointed out in your hypothetical, Your Honor, that if it was a verbal agreement that was later confirmed in writing, it would be valid. And that, I believe, is what happened here. When you look at the correspondence, specifically that supplemental excerpt of record 9 to 13, you'll see that letter where counsel for the union is writing back to Ms. Ganson and saying, we've had all these extensions trying to get this accomplished, but we're now terminating that exercise in trying to get there. And so my point is, if you're cooperating, if you're trying to, as you even put in your hypothetical, get something accomplished in the language that's in the contract and later confirm it in writing, there is an extension. And therefore, they can use that as addressing the timeliness that you wish they did to find the waiver. So I'm pointing out that if you look at the cases that we cited in our brief, virtually all of them talk about how limited the scope of review is. And if there was an interpretation of the collective barring agreement, it should be allowed to stand. And that's exactly what happened here. I'd like to reserve the rest of my time for rebuttal, please. You don't get rebuttal. Okay. Well, thank you. So you're free to use your other four minutes. All right. Well, I think that the key here, like I said, is that we have the language in the contract. The language talking about there being the ability to extend this time, which they did. The language that they started filing grievances once it was apparent that they were not going to be able to reach an agreement on the scheduling system. And most importantly, that there's a limitation of what this court should do, as there was with the district court. And the key here is, under the Railway Labor Act, and the Supreme Court has recognized this all the way back to the Steelworkers Trilogy, the idea here is, under collective bargaining agreements, the parties have selected arbitration as their method for resolving disputes, not litigation. And I think that's why this case should be affirmed and the reasoning of the Board of Adjustment should be followed. Thank you. Thank you. A few things. First of all, just correcting factually, the Southwest case at the Fifth Circuit did reverse on timeliness grounds. The district court had reversed that the arbitrator prematurely addressed the merits, but upheld the timeliness aspect of the award. The Fifth Circuit reversed. So I just wanted to clarify that. And, Marshall Durbin, I don't understand my colleague's effort to distinguish exactly what happened there. A missing of an entire step in the grievance process is what we are alleging here. But let me spend my time addressing this issue. Mr. Durbin, continue to confuse the 15A9 process with the solving of must-work days under the current system. 15A9 was about the negotiation of a letter of agreement and the selection of a new vendor to do the scheduling. It had nothing to do with whether or not the company was entitled, under the existing contract, to negotiate, I'm sorry, to solve for must-work days first, and nor was it required to do so sequentially. That had nothing to do with it. So these extensions, which were not in writing, the letters he cites are not written extensions of the 15A9 process, which doesn't have a written agreement. Am I right? Did you say in your briefing that the 15A9, there was a stipulation that that wasn't going to be considered in the arbitration? Am I remembering that right? You absolutely remember correctly. If you look at the statement of issues, as the union phrased it, as did the company violate 15B through 15I. So it left out 15A even in the statement of issues. So 15A9 was not part of the arbitration. Let me talk a little bit before I run out of time on the merits part of my argument, and I feel I need to do a little explanation why collective bargaining agreements are a little different than your typical commercial contract. In the commercial contract scenario, the parties don't have to contract. They choose to contract, and they come at the contracting with roughly equal power. That's not true in collective bargaining. In collective bargaining agreements, the parties by law are required to enter into a contract, and the company starts off with all the rights that it had before collective bargaining agreement. That's Warrior and Gulf, the Supreme Court said. The collective bargaining agreements restrict and regulate management conduct. They do not oust it from the performance of those functions. Management pays. Management promotes. Management plans. Management supervises. And absent a collective bargaining agreement, it has the right to do all those things. So we have a situation where the system board found nothing in the collective bargaining agreement specifically required solving sequentially, that is solving without paying attention to must work days first. The system board also found is it must because all the collective bargaining history evidence was from the company that the company's witnesses testified without contradiction they never agreed to give up this hard fought in litigation right to solve for must work days first. It's an important part of the company's business plan, and they would never have given it up. Anyone who said that they did is a liar. That's how stark the testimony was. So we've got a situation where we've got nothing in the collective bargaining agreement says you have to do this. We've got the company credited by the system board saying we didn't agree to this, and you've got the system board finding that the union by its silence didn't acquiesce. So you've got a classic case of no agreement. So what happens is in this case the company wins because, again, it starts with all the rights you have prior to a collective bargaining agreement. It's incumbent on the union to negotiate limitations and restrictions on those rights, and to the extent it doesn't, the company has the right to do that. That was the Appalachian Regional Health Care decision where it specifically overturned an arbitration award that it said because the contract didn't permit the company to do something, it couldn't. And so why don't you make whatever concluding point you have.  So, again, to our point, there are two ways in which the collective bargaining agreement was ignored by the system board. It exceeded its jurisdiction in reaching out and ignoring the plain language, not just the language on the written requirement, but also the language about the management rights, as well as the language saying the system board cannot add to or subtract from the collective bargaining agreement. Thank you.  We thank counsel for their argument, and the case just argued is submitted.
judges: GRABER, BENNETT, DESAI